IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LINDSEY ROSS, by an through her parents and next friends, MICHAEL and DIANE ROSS, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 05 C 6111 |
| v. | ) ) | Paul E. Plunkett, Senior Judge |
| BOARD OF EDUCATION OF TOWNSHIP HIGH SCHOOL DISTRICT 211, DR. DANIEL E. CATES, Director of Special Education, Township High School District 211 and DR. BENNETT L. LEVENTHAL, M.D., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Lindsey Ross ("Lindsey" or "Miss Ross") is an eighteen year-old female who was born with Rett Syndrome, a rare genetic neurological disorder that impairs her ability to communicate and move. By and through her parents and next friends, Michael and Diane Ross, on October 25, 2005, she filed a six-count complaint against the Board of Education of Township High School District 211 ("District 211"), Dr. Daniel Cates ("Dr. Cates") and Dr. Bennett Leventhal ("Dr. Leventhal"), arising from various difficulties connected with her special education at District 211. Before the Court are District 211 and Dr. Cates' motion to dismiss Counts I, II and III and Dr. Leventhal's motion to dismiss Counts IV, V and VI. All motions have been pursuant to Rule

-1-

12(b)(6) of the Federal Rules of Civil Procedure. For the reasons provided below, the motions are granted in part and denied in part.

## Legal Standard

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. *Blodgett v. Wachovia Nat. Bank, N.A.,* No. 04 C 6836, 2006 WL 140545, at *3 (N.D. Ill. Jan. 13, 2006) (citing *Forseth v. Village of Sussex,* 199 F.3d 363, 368 (7th Cir.2000)). No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)). Moreover, any ambiguities in the complaint will be construed in favor of the plaintiff. *Thompson v. Ill. Dep't of Prof'l Regulation,* 300 F.3d 750, 753 (7th Cir. 2002).

## Background

### I. Pre-Litigation/Settlement Facts.

The factual and procedural background of this case is complicated and has been divided into four chronological sections. As noted, Lindsey is an eighteen year-old female who has Rett Syndrome. Compl. ¶ 3. Notwithstanding her disorder, from first grade through eighth grade, Lindsey was enrolled in Schaumburg District 54's ("District 54") regular education program. *Id.* ¶ 10. This meant that she attended classes with her non-disabled peers, though District 54 adapted its regular education program in order to meet her individual needs. *Id.* Beginning in the spring of 2001, Lindsey's parents, employees of District 54 and employees of District 211, including its

director of special education, Dr. Cates, met to discuss Lindsey's transition between schools (middle school to high school) and educational districts (District 54 to District 211). *Id.* ¶ 12. According to her complaint, Lindsey alleges that at the outset Dr. Cates "believed [that she] would be better suited to a segregated environment due to her disability" rather than continuing to educate her in a regular education program with her non-disabled peers. *Id.* ¶¶ 13, 18. Thus, Dr. Cates turned down various offers of assistance from both officials at District 54 and from Lindsey's parents, who also offered, at their own expense, to pay for additional staff to help ensure a smooth transition for their daughter. *Id.* ¶¶ 14-15.

Thereafter, in May and June 2001, Lindsey's Individualized Education Program ("IEP") team met to review Lindsey's educational needs for the upcoming high school year as well as to set various goals and objectives.[1] *Id.* ¶ 18. In formulating Lindsey's IEP, Dr. Cates called for new and different educational goals than those of District 54. *Id.* ¶ 20. Though Lindsey alleges that these goals were initially were "unworkable," as Dr. Cates proposed reducing Lindsey's therapy services from the levels previously afforded to Lindsey by District 54, after being redrafted by Dr. Cates' staff, they were ultimately incorporated into her IEP. *Id.* ¶¶ 20- 21. Yet, notwithstanding District 211 and Dr. Cates' alleged desires to place Lindsey in a segregated learning environment, the final

---

[1] The Individuals with Disabilities Education Act, 20 U.S.C. § 1415(j), requires states that accept federal funding for educating disabled children to "provide them with a 'free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living.'" *Casey K. ex rel. Norman K. v. St. Anne Cmty. High School Dist. No. 302,* 400 F.3d 508, 509 (7th Cir. 2005) (quoting 20 U.S.C. § 1400(d)(1)(A)). "The particulars of the child's program are required to be set forth in an 'Individualized Education Program' devised by school officials in collaboration with the child's parents." *Id.* (citing 20 U.S.C. § 1414(d)).

IEP formulation required Lindsey to be educated in Conant High School's ("Conant") regular educational program with all of the services necessary to facilitate her education. *Id.* ¶ 19.

During the first semester of Lindsey's freshman year at Conant, staff informed her parents in multiple progress reports tracking Lindsey's IEP goals and objectives, that they were pleased with her progress. *Id.* ¶ 32. The staff noted that Lindsey had met almost all of her objectives, adding in one report that Lindsey "was 'a pleasure to have in class.'" *Id.* ¶ 33. Yet, despite Lindsey's first semester progress, during the middle of Lindsey's freshman year, it appears that progress started to erode as Lindsey allegedly began hitting her aides, resulting in numerous suspensions. *Id.* ¶¶ 35, 38. However, Conant later determined that the suspensions were a result of her disability, and Lindsey's behavior was attributed to three serious infections and the antibiotics used to treat those infections. *Id.* ¶¶ 35, 39. Indeed, one expert on Rett Syndrome retained by Lindsey's parents concluded that Lindsey's medical problems "contributed substantially to adverse behavior" adding "that he was 'confident that the [tonsillectomy] and addition of new medications will benefit her behavior in the future.'" *Id.* ¶ 39.

In an effort to determine Lindsey's placement for her sophomore year of high school, in May 2002, District 211 retained the University of Chicago's Developmental Disorders Clinic (the "Clinic") for a multidisciplinary evaluation in order to assess and update Lindsey's IEP. *Id.* ¶¶ 40-41. Dr. Leventhal, a member of the Clinic's evaluation team, purportedly observed Lindsey as "occasionally aggressive to others or hit[ting] herself" and made numerous psychopharmacological recommendations based on those observations.[2] *Id.* ¶ 44. The report ultimately concluded that

---

[2] Lindsey disputes the extent of Dr. Leventhal's observations. She alleges that his observations in the Clinic's report "were not based on actual medical observation or any other medically accepted form of evaluation, but appear to have merely parroted District 211's assertions."

Lindsey's behavior mandated a self-contained environment, such that "behavior control should be the primary focus of her programming for the next period of time in her educational plan with academics taking a distinctly secondary role." *Id.* ¶¶ 42, 45. Lindsey alleges that as a result of the Clinic's report, and Dr. Leventhal's "purported evaluation" therein, District 211 proposed on August 23, 2002, that Lindsey be placed in one of two self-contained, segregated schools for disabled children rather than return to Conant. *Id.* ¶ 51.

## II. District 211's Suit Against Lindsey and Her Parents and The Parties' Agreement Temporarily Settling that Suit.

Disagreeing with the District 211's recommendation, Lindsey's parents sought administrative review of the recommendation and attempted to invoke the Individuals with Disabilities Education Act's ("IDEA") "stay put" provision in an effort to keep their daughter enrolled in Conant's regular education program.[3] *Id.* ¶ 52. However, before Lindsey's parents could invoke the "stay put" provision, on August 27, 2002, District 211 filed suit in federal court, seeking a temporary restraining order to prevent Lindsey's parents from invoking the "stay put" provision.[4] *Id.* This first

---

Compl. ¶ 46.

[3] The "stay put" provision of the IDEA requires that a child remains in his or her "then-current educational placement" during the pendency of various proceedings under the IDEA and lifts when the proceedings are complete. 20 U.S.C.A. § 1415. This provision "has been interpreted as imposing an automatic statutory injunction, like the automatic stay in bankruptcy." *Casey K. ex rel. Norman K.*, 400 F.3d at 511.

[4] Since the Complaint as set forth by Lindsey is relatively silent as to this first lawsuit, this Court takes judicial notice of the record of the first suit, *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Michael R. and Diane R.*, No. 02 C 6098 (Kennelly, J.). This Court can take judicial notice of matters of public record without converting the Defendants' Rule 12(b)(6) motions into motions for summary judgment. *See, e.g., Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000); *Henson v. CSC Credit Serv.*, 29 F.3d 280, 284 (7th Cir. 1994). To the extent the Court uses these facts to aid

lawsuit was assigned to U.S. District Judge Kennelly and after several extensions of the temporary restraining order initially entered in the case, in November 2002, District 211 and the Rosses entered into a settlement agreement. *Id.* In pertinent part, they agreed that a panel of expert consultants (the "expert panel" or "panel") would be appointed, including Dr. Leventhal, all in an attempt to: (1) help plan for Lindsey's return to Conant; (2) train staff who would be working with Lindsey; and (3) recommend any changes to Lindsey's IEP such as to enable Lindsey to succeed at Conant.[5] *Id.* ¶ 52. Because of the settlement agreement, Judge Kennelly dismissed District 211's complaint with prejudice, but "retained jurisdiction to enforce the terms of the settlement." Minute Order, No. 02 C 6098 (N.D. Ill. Nov. 22, 2002) [doc # 9].

### III. Post-Settlement Facts, The Reinstatement of Litigation by District 211, the Administrative Hearing, Lindsey's Appeal Thereof and Judge Kennelly's Memorandum Opinion and Order Terminating That Litigation.

Though the parties entered into the settlement agreement in November 2002, the panel did not issue recommendations for Lindsey's return to Conant until March 2003 and Lindsey did not return to Conant until April 2003, doing so only on a part-time basis. Compl. ¶¶ 53, 55. Lindsey's return was generally regarded as successful and she "developed a positive rapport" with a particular special education teacher and also an aide. *Id.* ¶ 56. Similar to the first semester of her freshman year, Lindsey again met virtually all of her IEP goals and in comparison to the second semester of that year, Lindsey's behavior improved and she exhibited minimal behavioral problems. *Id.* ¶ 57.

---

its decision, it does so solely to determine the appropriateness of the preclusive doctrines of *res judicata.*

[5]Rather than have their daughter educated in segregated learning environment, Lindsey's parents temporarily withdrew her from schooling at District 211.

Following Lindsey's April 2003 part-time return to Conant, her parents desired to increase the amount Lindsey's educational workload. *Id.* ¶ 60. To this end, they sought action by the panel "to address when and to what extent [Lindsey] could increase her participation at Conant." *Id.* ¶ 60. Yet, as Lindsey alleges, the panel's members had little contact with each other, particularly with Dr. Leventhal, who failed to attend meetings, observe Lindsey at home or school and did not participate in training Lindsey's staff. *Id.* Dr. Leventhal's alleged actions (or inactions) if true, clearly reflect his stated desire to "get out of this mess." *Id.* ¶¶ 61-62.

Despite Lindsey's progress in the spring of 2003, Lindsey alleges that District 211 officials denied her "the benefit of an appropriate summer program, even though the Expert Panel had agreed that [she] would benefit from extended school year programming over the summer." *Id.* ¶ 59. Further, during that summer, Lindsey's parents sought to ensure that District 211 retained staff they felt had worked so well with their daughter in the past. *Id.* ¶ 68. Instead, they allegedly refused to rehire Lindsey's aide and also replaced Lindsey's speech therapist. *Id.* ¶ 69. Moreover, she alleges that they waited "until the last minute" to hire aides for Lindsey, instead relying on "unqualified administrators" despite the fact that Lindsey's old aide and speech therapist were still available. *Id.* ¶ 70.

Toward the end of the summer of 2003, Lindsey's parents and school officials again met to discuss Lindsey's IEP. *Id.* ¶¶ 64, 66. After what she asserts was only after considerable pressure from her parents and legal counsel, Lindsey contends that the members of the panel, with the exception of Dr. Leventhal, met to plan Lindsey's return to Conant for the fall semester 2003. *Id.* ¶ 63. Indeed, according to Lindsey's complaint, the dysfunction of the expert panel is demonstrated not only by Dr. Leventhal's absence, but also by another member's belief that, according to Lindsey,

"he could not ethically continue in his role as a panel member due to the process being dysfunctional." *Id.* ¶ 66. Again, Conant officials reiterated their position that Lindsey should not be placed at Conant, and instead offered to place Lindsey anywhere outside their district. *Id.* ¶ 64.

Notwithstanding this position, Lindsey's parents and District 211 ultimately agreed that Lindsey should still continue at Conant on a reduced schedule, but one that significantly increased her workload in comparison to her schedule of the previous spring. *Id.* ¶ 67. Again, Lindsey alleges that she received less services that semester, stating that "Conant staff arbitrarily reduced [her] occupational, physical, and speech therapy during this time without any feedback from the Expert Panel as to whether this denial of benefits was desirable, even though [Lindsey's] course load had been increased." *Id.* ¶ 74. Yet, despite Lindsey's return to Conant, in October 2003, District 211 informed Lindsey's parents that it planned on again recommending that Lindsey be placed in a segregated learning environment. Thus, in the November 2003 IEP meeting, the district "again attempted to change [Lindsey's] educational placement, although, as Lindsey provides, the expert panel "indicated that [her] needs could be met in an individualized education program in a regular high school." *Id.* ¶ 77.

Thereafter, on November 9, 2003, approximately one year after the entry of the settlement agreement for the first lawsuit, District 211 and the Rosses found themselves back in court before Judge Kennelly. District 211 reinitiated litigation by filing an emergency motion for relief pursuant to the terms of the settlement agreement. *See* District 211's Emergency Mot. For Relief *in* No. 02 C 6098 (filed Nov. 9, 2003) [doc. # 10]. Therein, District 211 sought to resolve the disagreement as to whether Lindsey should continue to be educated at Conant. *See id.* at 1. In response, Lindsey, by and through her parents, sought a temporary restraining order and preliminary injunction which

would require Lindsey's return to Conant, find that Conant should be her "stay put" educational placement, and to set aside the settlement agreement as null, void and unenforceable. *See* Lindsey's Mot. for TRO & Prelim. Inj. *in* No. 02 C 6098 (filed Nov. 10, 2003) [doc. # 14]. At that time, Lindsey also answered District 211 original complaint, adding several counterclaims as well.[6] *See* Lindsey's Ans. & Countercl. *in* No. 02 C 6098 (filed Nov. 10, 2003) [doc. #15]. The counterclaims sought relief for District 211's alleged failures to: (1) provide Lindsey with a free appropriate public education; (2) utilize appropriate functional behavioral analyses or behavior intervention plans; (3) obtain Lindsey's parents' consent prior to the administration of a psychiatric evaluation by Dr. Leventhal and the University of Chicago's Developmental Disorders Clinic; (4) provide Lindsey with accommodations or support in a timely matter; and (5) to consider less restrictive educational options than an out of district placement. *Id.* The counterclaim also alleged a breach of the settlement agreement. *Id.*

Around that same time, Lindsey's parents requested (and received) the reinstatement of the due process hearing which they initiated in August 2003 in their failed attempt to invoke the IDEA's "stay put" provision. An independent hearing officer was reappointed and presided over forty-two days of testimony - the longest special education due process hearing in Illinois history. *See Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Michael R. & Diane R.,* No. 02 C 6098, 2005 WL 2008919,

---

[6]Lindsey's use of "cross complaint" rather than counterclaim is a malapropism. However, because the pleading made allegations against District 211, an opposing party, rather than against a co-defendant or co-party, it is properly labeled a counterclaim. *See generally* FED. R. CIV. P. 13 (governing the filing of counterclaims and cross-claims). Moreover, while Lindsey filed a counterclaim at this time, the Court notes that the counterclaim was later amended after an administrative hearing was conducted. The Court also notes that in comparing the paragraphs of Lindsey's counterclaims in the first action with those found in her complaint in this action there are no less than 28 paragraphs which are factually analogous. *Compare* Ans. & Countercl. *in* No. 02 C 6098 (filed Nov. 10, 2003) *with* Compl.

at *7 (N.D. Ill. Aug. 15, 2005). On August 23, 2003, the hearing officer issued a sixty-one page decision in which she concluded that District 211's educational placement decision was appropriate. Thereafter, on October 12, 2004, Lindsey amended her counterclaim to appeal the independent hearing officer's decision to Judge Kennelly and to change the specific counterclaims she asserted against District 211. Among the changes to her counterclaim, Lindsey added a claim that various actions of District 211, the independent hearing officer and the Illinois State Board of Education (who Lindsey added as a cross-defendant) were in violation of the Americans with Disabilities Act and also with Section 504 of the Rehabilitation Act. Furthermore, Lindsey added a count that contended that the decision of the independent hearing officer should be overturned by alleging that District 211 created a hostile environment for Lindsey.

After reviewing cross-motions for summary judgment, Judge Kennelly found that District 211 satisfied its burden to provide Lindsey with a free adequate public education, see *id.* at *16, noting that "[t]he preponderance of the evidence supports the conclusion that Lindsey gained no meaningful educational benefit from her time at Conant and that she would be better served in a multi-needs school, as proposed by the District." *Id.* at * 20. Judge Kennelly also found no material breach of the settlement agreement entered into by the parties in November 2002. *Id.* at *22.

In holding for District 211, Judge Kennelly also reviewed various procedural challenges to the independent hearing officer's decision, including Lindsey's argument that the hearing officer improperly prevented her "from presenting evidence of past behavior of District 211 administrators which allegedly would have shown its bad faith in implementing Lindsey's program" as well as her ADA and Rehabilitation Act claims. *Id.* at *25. As to the issue of past evidence, Judge Kennelly found that the independent hearing officer's decision was not unreasonable and thus did not warrant

reversal since "the purpose of the hearing was to determine the appropriateness of Lindsey's placement." *Id.* As to the ADA and Rehabilitation Act claims, Judge Kennelly noted:

> The Court's ruling that the District did not violate the IDEA in placing Lindsey in a self-contained, special education setting, also requires denial of defendants' ADA and Rehabilitation Act claims. In addition, as the District argues, defendants have offered no evidence from which a fact finder reasonably could determine that the District intentionally discriminated against or failed to accommodate Lindsey based on her disability."

*Id.* Thus, Judge Kennelly granted District 211's motion for summary judgment while denying Lindsey's and entered judgment in favor of District 211. *Id.* On September 13, 2005, Lindsey appealed Judge Kennelly's decision to the Seventh Circuit and her appeal remains pending.


**IV. Procedural Background of the Present Litigation.**

Thereafter, and as noted above, on October 25, 2005, Lindsey filed her six-count complaint against District 211, Dr. Cates and Dr. Leventhal in what she characterizes as an attempt "to redress a pattern and practice of discrimination." Pl.'s Mem. Resp. Dist. 211/Cates' Mot. to Dismiss at 2. Now, in Counts I and II, Lindsey alleges that District 211 violated the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794, in that "[t]he actions of District 211's staff and employees resulted in the discrimination against and exclusion of Miss Ross from the services, programs and activities to which she was statutorily and constitutionally entitled for . . . solely by reason of her disability." Compl. ¶¶ 94, 99. In Count III, she also alleges that Dr. Cates, as director of District 211's special education program, violated the Civil Rights Act, 18 U.S.C. § 1983, "in bad faith and in violation of Miss Ross's rights, and/or as part of a custom and practice to deny or refuse services to children with disabilities at Conant" such as to deprive Lindsey "of her

right to services, programs and activities to which she was otherwise entitled without due process of law and denied her the equal protection of the law." *Id.* ¶ 105.

While Counts I through III are against District 211 and Dr. Cates and are based on federal law, in her present complaint, Lindsey added state law claims in Counts IV through VI to focus on Dr. Leventhal actions. Count IV alleges medical malpractice against Dr. Leventhal in that he breached his duty of care owed to his patient, Lindsey, by: (1) conducting a psychiatric and physical examination of Lindsey absent her parents' consent; (2) making a pharmacological recommendation without a proper examination; (3) reporting on Lindsey's health and behavior and thereby recommending an educational placement not based on medical observations or data; and (4) submitting false testimony at a due process hearing regarding Lindsey's educational placement. *Id.* ¶ 110. Additionally, like in her malpractice count, Count V and VI respectively allege violations of the Illinois Mental Health Code, 405 ILL. COMP. STAT. 5/2-107, and common law battery against Dr. Leventhal for his administration of a psychiatric and physical exam of Lindsey in the absence of parental consent. *Id.* ¶¶ 112-121.

In response to Lindsey's complaint, on November 30, 2005, District 211 and Dr. Cates moved to dismiss the counts against them on the grounds of *res judicata* and collateral estoppel. *See generally* Dist. 211/Cates' Mem. Supp. Mot. to Dismiss. Thereafter, on January 9, 2006, Dr. Leventhal likewise moved to dismiss all claims against him. As with District 211 and Dr. Cates, Dr. Leventhal argues that *res judicata* bars all claims against him. Additionally, he claims that dismissal as to all claims against him is appropriate because Lindsey released her claims by virtue of the November 2002 Settlement Agreement and also because Lindsey failed to comply with Illinois Code of Civil Procedure Section 2-622's affidavit requirements in malpractice actions. As to arguments

for particular claims asserted against him, Dr. Leventhal contends that Lindsey failed to adequately plead her medical malpractice claim, that the count alleging a violation of the Illinois' Mental Health Code should be dismissed because it does not contain a private right of action and that the Court should strike Lindsey's request for attorney's fees against him. *See generally* Leventhal Mem. Supp. Mot. to Dismiss. With this background in mind, the Court turns to the issues presented by the Defendants in their motions to dismiss.

**Discussion**

## I.    Res Judicata

According to the Defendants, Lindsey's complaint must be dismissed because of the preclusive effect of the lawsuit brought by District 211 against Lindsey's parents, individually and as next friends of Lindsey. *See Bd. of Educ. of Tp. High School Dist. No. 211 v. Michael R. & Diane R.*, No. 02 C 6098, 2005 WL 2008919, at *1 (N.D. Ill. Aug. 15, 2005) (Kennelly, J.). Moreover, they argue for a preclusive effect of the administrative due process hearing before the Illinois State Board of Education.

"Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *San Remo Hotel, L.P. v. City and County of San Francisco*, 125 S. Ct. 2491, 2500 (2005) (citing *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). "Because the prior litigation was brought in federal court on a federal claim, the federal rule of *res judicata* determines whether *res judicata* applies to the present action." *Cent. States, SE & SW Areas Pension Fund v. Hunt Truck Lines, Inc.*, 296 F.3d 624, 628 (7th Cir. 2002) (citing *In the Matter of Energy Co-op., Inc.*, 814 F.2d 1226, 1230 (7th Cir.1987)). "The three

requirements for *res judicata* under federal law are: (1) an identity of the parties or their privies; (2) an identity of the causes of actions; and (3) a final judgment on the merits." *Id.* The Court will examine each element in order, but only to the extent such elements pertain to Lindsey's claims against District 211 and Dr. Cates and without addressing the applicability of *res judicata* on Lindsey's claims against Dr. Leventhal.

### A. *Identity of Parties or Their Privies*

The first issue this Court must address in considering any *res judicata* argument is to identify whether the parties in the present case were either parties in the prior litigation or in privity with a party therein. While the definition of a "party" is clear enough, the definition of "privity" needs elaboration. In defining "privity," the Seventh Circuit has noted that it "is now seen as 'a descriptive term for designating those with a sufficiently close identity of interests.'" *Tice v. Am. Airlines, Inc.,* 162 F.3d 966, 971 (7th Cir. 1998) (quoting *In Matter of L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir.1993)).

Clearly, District 211, as plaintiff in the first suit and now defendant in this suit, can be considered a "party" for *res judicata* purposes. Moreover, the Court finds that there is privity between the first suit and this suit with respect to Lindsey and her parents, who at all times appear to have been represented by counsel. In the first suit, District 211 sued Lindsey's parents "individually and as next friends of Lindsey R., a minor." In the present suit, Lindsey "by and through her parents as next friends" is suing District 211, Dr. Cates and Dr. Leventhal. *See Whisby-Myers v. Kiekenapp,* 293 F. Supp. 2d 845, 853 (N.D. Ill. 2003) (citing Rule 17 of the Federal Rules of Civil Procedure and noting that parents have standing to sue on behalf of their children). *See also*

-14-

*Doe v. Montessori School*, 678 N.E.2d 1082, 1089-90 (Ill. App. Ct. 1997) (noting under Illinois law that a minor cannot litigate except through a guardian, guardian ad litem, or next friend under Illinois law); *Blue v. Illinois*, 585 N.E.2d 625, 596 (Ill. App. Ct. 1992) (noting under Illinois law that a parent proceeding as a "next friend" must obtain counsel before proceeding in the case). Indeed, it is through her parents that Lindsey is currently asserting a claim that she was intentionally discriminated against because of her disability. Thus, there is privity with respect to Lindsey in this and the earlier litigation.

But what about Dr. Cates? Admitting (as he must) that he was not a party to the first lawsuit, Dr. Cates argues that he is in privity with District 211 because of his position as director of special education for District 211 and also because of the allegations made as to him in the first and present lawsuits. Dist. 211/Cates Mem. Supp. Mot. to Dismiss at 12. Because Lindsey has sued Dr. Cates under Section 1983, it is necessary to determine whether she his suing him in his personal or official capacity. If she is suing him in his official capacity, privity exists, see *Gray v. Lacke*, 885 F.2d 399, 405 (7th Cir. 1989), but if she is suing him in his personal capacity, it does not, see *Connor v. Reinhard*, 847 F.2d 384, 395 (7th Cir. 1988). Further, use of a defendant's "official title" in a complaint is evidence that the defendant is being sued in his or her official capacity, as is a "challenge[] to an official policy or custom." *Miller v. Smith*, 220 F.3d 491, 494 (7th Cir. 2000).

The Court finds that Lindsey is suing Dr. Cates in his official capacity. In drafting the caption to her complaint, Lindsey lists Dr. Cates as a defendant, thereafter listing his position as "Director of Special Education, Township High School District 211." *See* Compl. Moreover, in several paragraphs of her Section 1983 claim, Lindsey specifically references Dr. Cates' position when making allegations against him. *See, e.g.,* Compl. ¶¶ 105, 106 ("By his actions and the actions

-15-

of persons directly and indirectly responsible to him *in his role as Director of Special Education for District 211*, Dr. Cates, in bad faith and in willful violation of Miss Ross's rights . . . ."); *id.* ¶ 107 ("As a direct and proximate result of the actions and inactions of Dr. Cates *in his role as Director of Special Education for District 211*. . . .") (emphases added). She also sues him, in part, for his actions which she alleges are "part of a custom and practice to deny or refuse services to children with disabilities at Conant" - a clear challenge to what she appears to believe is an official custom at District 211. *Id.* ¶¶ 105-06. Thus, the Court finds that Dr. Cates is in privity with District 211 in the prior lawsuit, especially when Lindsey herself does not dispute this element in her response brief. Accordingly, as to District 211 and Dr. Cates, the Court will turn to the next requirement for *res judicata* under federal law, namely, whether there is an identity of the causes of action between this lawsuit and the previous lawsuit.

### B. *Identity of the Causes of Actions*

The next issue the Court will address is whether an identity of causes of action exist between the first lawsuit and this lawsuit. According to District 211 and Dr. Cates, an identity is shown in a number of ways. First, they contend that the core facts of the two lawsuits are the same in that both actions challenge the District's actions toward Lindsey while she was enrolled at Conant. Dist. 211/Cates Mem. Supp. Mot. to Dismiss at 9-10. Second, they argue that Lindsey has alleged the same claims as were alleged in the first suit, *i.e.* violations of the ADA and the Rehabilitation Act, claims conclusively decided by Judge Kennelly. *Id.* at 11. Finally, District 211 and Dr. Cates contend that Lindsey's addition of a Section 1983 violation by Dr. Cates does not create a new cause of action where the "same set of core facts forms the basis of both proceedings." *Id.*

In response, Lindsey argues that her current claims were not raised in the first lawsuit because that lawsuit was governed by the November 2002 settlement agreement, which she argues limited the scope of the first lawsuit. Pl.'s Resp. Dist. 211/Cates Mot. to Dismiss at 8-9. Thus, she asserts that her present claims could not have been brought in the first suit because "[t]he application of the Settlement Agreement to the First Lawsuit closed the door on a host of issues that might otherwise been addressed" adding that her current counts "are based primarily on facts occurring prior to the November 2002 Settlement Agreement." *Id.* Moreover, she notes "[n]either the Administrative Hearing, nor the subsequently brought cross claims, addressed pre-settlement facts." *Id.* Indeed, she points out that District 211 successfully objected to any attempt to introduce pre-settlement facts in the administrative hearing. *Id.* at 13.[7]

"A claim has 'identity' with a previously litigated matter if it emerges from the same 'core of operative facts' as that earlier action." *Brzostowski v. Laidlaw Waste Systems, Inc.*, 49 F.3d 337, 339 (7th Cir. 1995) (quoting *Colonial Penn Life Ins. Co. v. Hallmark Ins. Admin., Inc.*, 31 F.3d 445, 447 (7th Cir.1994)). "Two claims are one for the purposes of res judicata if they are based on the same, or nearly the same, factual allegations." *Id.* "Because the function of res judicata is to require the joinder of all legal challenges to a wrong, and all claims for relief arising out of those events, *without* compelling the joinder of claims arising from separate wrongs, . . . claims 'based on the same, or nearly the same, factual allegations' must be joined." *Roboserve, Inc. v. Kato Kagaku Co.,*

---

[7]However, settlements have a way of merging with pre-settlement claims. This argument that because the facts are "pre-settlement facts," Ross' claim may move forward is unavailing. When looking at the language of the settlement we note that not only are the facts the same, but so are the parties, or their privies. The settlement clearly states that the parties released Defendant from any and all claims "which have or may have arisen as a result of the past actions or inactions of the School District . . ." (Plf.'s Ex. 1.) We have not been presented with a matter that is outside of the terms of the settlement agreement.

*Ltd.*, 121 F.3d 1027, 1034 (7th Cir. 1997) (quoting *Perkins v. Board of Trustees of the Univ. of Illinois*, 116 F.3d 235, 236-37 (7th Cir.1997)) (citations omitted, emphasis in original).

Here, Lindsey's present claims against District 211 and Dr. Cates arise out of the same or nearly the same factual allegations as District 211's complaint seeking an injunction. As a result, Lindsey's current claims, based primarily on pre-settlement facts, should have been brought in the first lawsuit. In reaching this conclusion, the Court notes the operation of Rule 13(a) of the Federal Rules of Civil Procedure, which required Lindsey to assert all of her claims in the first lawsuit in order to avoid being unable to litigate them later. The Seventh Circuit has discussed the relationship between Rule 13(a) and the doctrine of *res judicata,* noting as follows:

> Despite the impression one might get from the name of the doctrine, no one is "compelled" to present a compulsory counterclaim. Only a litigant that wants to avoid a later defense of preclusion need do so. The definition of a compulsory counterclaim - a claim that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim"- mirrors the condition that triggers a defense of claim preclusion (res judicata) if a claim was left out of a prior suit.

*Publicis Commc'n v. True North Commc'ns Inc.*, 132 F.3d 363, 365 (7th Cir. 1997). Thus, "Rule 13(a) establishes that a defendant's omission [of a counterclaim in the first suit] has the same consequences as a plaintiff's" omissions: they are prevented from raising that claim at a later date. *Id. See also CIVIX-DDI, LLC v. Expedia, Inc.*, No. 04 C 8031, 2005 WL 1126906, at *3 (N.D. Ill. May 2, 2005) ("Rule 13(a) promotes judicial economy by avoiding multiple actions involving disputes arising from a common factual background.") (citing *In re Price*, 42 F.3d 1068, 1073 (7th Cir.1994)).

Here, in examining District 211's verified complaint for injunctive relief, the Court notes that

its facts parallel those found in Lindsey's present complaint. Indeed, examples are abundant and are

set forth as follows. First, in Paragraph 11 its complaint, District 211 pleads

>    11.    On May 21 and July 11, 2001, District 211 met to review the District
> 54 eligibility statement as it existed at the time and also to clarify the adverse effect
> of disability on educational performance, due to somewhat unclear language received
> from District 54. District 211 then confirmed the "Other Health Improvement" and
> "Speech Language" as Lindsey's disability categories . . . And, in deference to
> Parents, the Team recommended placement in a "mainstream" educational
> environment, with supplementary resource help and the related services of
> occupational therapy, physical therapy and speech/language therapy. Lindsey's
> parents were in attendance at both of these meetings, had meaningful and detailed
> participation at the meetings, and were in agreement with the recommendation.

Dist. 211 V. Compl. Inj. ¶ 11. Similarly, in her present complaint, Lindsey discusses in Paragraphs

10 through 21 her transition from District 54 to District 211, particularly the IEP meeting that spring.

Specifically, she notes in Paragraphs 18 and 19 that

>    18.    On May 21 and July 11, 2001, Miss Ross's Individualized Education
> Program ("IEP") team met to review Miss Ross's eligibility for special education in
> high school, to review the potential adverse effects of her disability, and to determine
> educational placement needs. Miss Ross believes, and on that basis alleges, that Dr.
> Cates believed and desired at that time and following that Miss Ross should be
> placed in a self-contained environment, rather than be included in the same programs
> and activities as her peers as she had been in grade school and middle school.

>    19.    However, in purported deference to Miss Ross's parents, Miss Ross's
> IEP called for her placement in regular education at the James B. Conant High
> School ("Conant") with all appropriate services.

Compl. ¶¶ 18-19.

Secondly, in Paragraphs 15 and 16 of District 211's complaint, the District discusses

Lindsey's "extremely high number of self-injurious and physically aggressive behaviors" noting that

those "behaviors increased dramatically after she returned from Winter Break in January 2002" and

documenting those behaviors between September 2001 and May 2002. Dist. 211 V. Compl. Inj.

Relief ¶¶ 15-16. But now, in Paragraph 36, Lindsey alleges that

> 36. Despite the school staff's knowledge of Miss Ross's disabilities and despite their perception that Miss Ross's behavior was deteriorating, the school did not take steps to understand the underlying cause of Miss Ross's behavior, but instead continued to institute punitive measures and continued to build a record against Miss Ross by collecting data on the frequency of behavior incidents without regard to cause or effective treatment.

Compl. ¶ 36.

Third, in Paragraph 18 of its complaint, District 211 noted that "[a]s Lindsey's injurious behaviors increased, they had an increasingly negative impact on her ability to be included in the mainstream" adding that "[w]hen she became a substantial risk to the safety of other students and staff, Lindsey was removed from her regular education classes and taken to a quiet, alternative learning environment, referred to as a 'calming room,' that was constructed especially for her by District 211 and included private washroom facilities." Dist. 211 V. Compl. Inj. ¶ 18. Now, Lindsey attempts to use this "calming room" as evidence of District 211's "willful discrimination in attending to Miss Ross's behavioral needs during her Freshman year . . . ." Resp. Dist. 211/Cates Mot. to Dismiss at 4 (citing Compl. ¶¶ 24-27).

Fourth, in Paragraph 25 of its complaint, District 211 notes that it "sought a private evaluation from the University of Chicago Developmental Disorders Clinic headed by Marrea Winnega, Ph.D." Dist. 211 V. Compl. Inj. ¶ 25. Similarly, Lindsey alleges in Paragraphs 40 and 41 that "District 211 hired the University of Chicago Developmental Disorders Clinic . . . to conduct an evaluation of Miss Ross" adding that the subsequently conducted evaluations were conducted, in part, by Marrea Winnega, Ph.D. Compl. ¶¶ 40-41. Moreover, the report issued by the University

-20-

of Chicago's Clinic, along with the recommendations contained therein, are discussed in both District 211's and Lindsey's respective complaints. *Compare* District 211 Compl. ¶ 33 *with* Compl. ¶¶ 41, 44-46, 51. Lindsey now alleges that the decision to educate her in a segregated learning environment "was purportedly based in large part upon the recommendations of the Report," Compl. ¶ 51, and the August 23, 2002 IEP meeting, where Lindsey's parents were first informed of this decision, is reflected in detail in both District 211's verified complaint and in Lindsey's present complaint. *Compare* District 211's V. Compl. Inj. ¶¶ 34-38 *with* Compl. ¶¶ 40-51.

Finally, in Paragraph 49 of its verified complaint, District 211 states its recommendation for educating Lindsey at either the Kirk School or Little Friends. Dist. 211 V. Compl. Inj. ¶ 49. However, Lindsey characterizes this placement decision differently in her present attempt to paint a broad picture of discrimination. Thus, she contends that District 211's decision to place her at either the Kirk School or Little Friends, "two self-contained, segregated schools for children with disabilities" was "not surprising" "[g]iven Dr. Cates's pervasive disdain for educating Miss Ross with her non-disabled peers." Compl. ¶ 51.

Before the Court turns to the next element of *res judicata,* it will address Lindsey's arguments regarding "pre-settlement" facts and their role in the prior litigation. Lindsey contends that *res judicata* is inapplicable because she was unable to present evidence of "pre-settlement" facts in both the administrative hearing and before Judge Kennelly. She asserts that her "present claims against District 211 and Dr. Cates *are based primarily on facts occurring prior to the November 2002 Settlement Agreement*" adding that the facts occurring after the November 2002 settlement "either provide context and support for the pattern of discrimination and hostility that began during

Miss Ross's Eighth Grade year." [8] Pl.'s Resp. Dist. 211/Cates Mot. to Dismiss at 8 (emphasis

added). Yet, and as outlined above, District 211's complaint for an injunction, which provides the

basis for determining what claims she would be "compelled" to present via Rule 13(a), solely relied

on pre-settlement facts. Indeed, by its very nature, it had to because the settlement had yet to occur.

Moreover, while the independent hearing officer did not let Lindsey present evidence of pre-

settlement behavior, Judge Kennelly noted that he allowed Lindsey and her parents to depose District

54's superintendent, permitting them to supplement the record before him. *See* 2005 WL 2008919,

at *25. After reviewing the testimony, Judge Kennelly concluded that "it did not require the IHO's

decision to be overturned." *Id.* Thus, the core set of operative, pre-settlement facts, which gave rise

to District 211's request for an injunction also required Lindsey to assert all claims which arose out

of those facts. *See* FED. R. CIV. P. 13(a).

### C.  *Final Judgment on the Merits*

The final issue this Court must determine in analyzing District 211 and Dr. Cates' *res*

*judicata* arguments is whether a final judgment on the merits was made in the litigation initiated by

District 211. "A final judgment on the merits is based upon legal rights as opposed to simple matters

of practice, procedure, jurisdiction, or form," *see Little v. Tapscott*, No. 01 C 9738, 2002 WL

1632519, at *3 (N.D. Ill. July 23, 2002) (citing *Harper Plastics, Inc. v. Amoco Chemicals Corp.*, 657

F.2d 939, 943 (7th Cir.1981)), and "[s]ummary judgment constitutes a final judgment on the merits

---

[8]Note, if Lindsey's complaint was based *solely* rather than "primarily" on pre-settlement facts, she would have a difficult time defending against statute of limitation based attacks, as claims under the ADA and Rehabilitation Act are required to be brought within two years of the November 2002 settlement. *See Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 551 (7th Cir.1996); *Dunn v. Grant Hosp. of Chicago*, No. 95 C 3699, 1997 WL 51450, at *2 (N.D. Ill. Jan. 30, 1997).

for purposes of applying res judicata." *Id.* (citing *Lester v. Brown* 929 F. Supp. 291, 293 (N.D. Ill.1996)). In the prior litigation, Judge Kennelly issued a 47-page memorandum opinion and order after reviewing the parties' cross-motions for summary judgment, making his decision based upon the relevant facts and controlling legal principles. As a result, the Court finds that Judge Kennelly's opinion, disposing of the underlying litigation, was a final judgment on the merits.[9] Accordingly, the Court finds that *res judicata* precludes Lindsey from bringing her present claims against District 211 and Dr. Cates, thus, Counts I, II and III are dismissed with prejudice.

## II.    The Court Declines to Exercise Supplemental Jurisdiction To Hear Lindsey's Claims Against Dr. Leventhal.

Having dismissed Lindsey's claims against District 211 and Dr. Cates, claims based primarily on federal question jurisdiction, the Court also dismisses her claims against Dr. Leventhal, claims based not on federal question jurisdiction or even diversity jurisdiction, but on supplemental jurisdiction.[10]    Generally, where district courts have original jurisdiction, they also have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367. When a district court has dismissed the claims over which it had original jurisdiction, it can also decline to exercise its supplemental jurisdiction over

---

[9]Moreover, in reaching this decision, the Court notes that Lindsey's response to District 211's motion to dismiss does not contain any argument that would dispute the finding that Judge Kennelly's decision was a final judgment on the merits.

[10]Lindsey also bases her claims against District 211 and Dr. Cates on 28 U.S.C. § 1343, which grants jurisdiction in civil rights cases. *See* Compl. ¶ 8. Further, and as noted, three counts in Lindsey's complaint pertain to Dr. Leventhal and are based on state law. *See id.* ¶¶ 108-11 (medical malpractice); 112-16 (Illinois Mental Health Code); 117-120 (battery).

the state-law claims. *See* 28 U.S.C. § 1367(c)(3). *See also Williams v. Aztar Ind. Gaming Corp.* 351 F.3d 294, 300 (7th Cir. 2003) (quoting *Wright v. Associated Insurance Companies Inc.,* 29 F.3d 1244, 1251 (7th Cir.1994) for its proposition that "the general rule is that once all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolv[e] them on the merits"). "In exercising that discretion, the court should consider a number of factors, including 'the nature of the state law claims at issue, their ease of resolution, and the actual, and avoidable, expenditure of judicial resources . . . .'" *Rothman v. City of Chicago,* No. 02 C 3533, 2004 WL 2271851, at \*3 (N.D. Ill. Oct. 6, 2004) (quoting *Timm v. Mead Corp.,* 32 F.3d 273, 277 (7th Cir.1994)).

Here, in declining to exercise supplemental jurisdiction over Lindsey's state law claims against Dr. Leventhal, the Court does so in part because of the nature of the state law claims at issue and Dr. Leventhal's specific arguments supporting dismissal thereof. Indeed, several issues raised by Dr. Leventhal are best left to the state courts to resolve, particularly his dispute with Lindsey about whether the Illinois Mental Health Act creates a private right of action and whether her medical malpractice claim has met the requirements of Section 2-622 of the Illinois Civil Procedure Code. Accordingly, because the Court declines to exercise supplemental jurisdiction over Counts IV, V and VI of Lindsey's complaint and dismisses those counts without prejudice.

## Conclusion

For the reasons provided above, the Court grants District 211 and Dr. Cates' motion to dismiss Counts I, II and III of Lindsey's complaint with prejudice. The Court also grants in part and denies in part Leventhal's motion dismiss Counts IV, V and VI of Plaintiff's complaint. The Court

has declined to continue to exercise supplemental jurisdiction over Lindsey's state law claims against Dr. Leventhal. Counts IV, V, and VI are dismissed without prejudice, leaving Lindsey free to file her claims against Dr. Leventhal in state court.

**ENTERED:**

**DATED:** **MAR 1 4 2006**

                                     **UNITED STATES DISTRICT JUDGE**